UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC CHARLES RODNEY K'NAPP,<br><br>Plaintiff,<br><br>vs.<br><br>D. G. ADAMS, et al.,<br><br>Defendants. | 1:06-cv-01701-LJO-GSA-PC<br><br>FINDINGS AND RECOMMENDATIONS,<br>RECOMMENDING THAT DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT<br>BE GRANTED<br>(ECF No. 136.)<br><br>OBJECTIONS, IF ANY, DUE WITHIN<br>TWENTY DAYS |

## I.   BACKGROUND

Eric Charles Rodney K'napp ("Plaintiff") is a state prisoner proceeding pro se with this civil rights action filed pursuant to 42 U.S.C. § 1983.   Plaintiff filed the Complaint commencing this action on November 22, 2006.  (ECF No. 1.)  This action now proceeds on the Second Amended Complaint filed by Plaintiff on November 13, 2008, against defendants Warden Derral G. Adams, Lieutenant ("Lt.") E. Smith, Lt. J. T. Tucker, Associate Warden S. Sherman, and D. Selvy (Classification Services Representative), for retaliating against Plaintiff by confining him in Ad-Seg under false pretenses and transferring him to another prison, and against defendants K. Motty, Sgt. C. Pugliese, Lt. Smith, R. Guerrero, Appeals Coordinator Cooper, Appeals Coordinator V. R. Garcia, Appeals Coordinator R. Hall, and Does 1-5 (Mailroom Workers) for interfering with his right to send mail in violation of the First Amendment.[1]  (ECF No. 16.)

---

[1]On March 12, 2012, Plaintiff's claims for retaliation based on allegations that defendants (1) denied him indigent correspondence supplies, (2) delayed his mail, (3) obstructed his outgoing mail, (4) denied him all but the May 2005 issue of his subscription of Prison Legal News, (5) issued a false disciplinary write-up

1

On October 22, 2014, defendants Adams, Smith, Tucker, Sherman, Selvy, Motty, Pugliese, Cooper, Garcia, and Hall filed a motion for summary judgment.[2] (ECF No. 136.) On January 15, 2015, Plaintiff filed an opposition to the motion. (ECF No. 147.) On July 2, 2015, defendant Guerrero filed a notice of joinder in the October 22, 2014 motion for summary judgment. (ECF No. 150.) Defendants have not filed a reply to Plaintiff's opposition.

Defendants' motion for summary judgment is now before the court. Local Rule 230(*l*). For the reasons that follow, the court recommends that Defendants' motion be granted.

## II.   PLAINTIFF'S CLAIMS AT ISSUE[3]

Plaintiff is in the custody of the California Department of Corrections and Rehabilitation (CDCR), currently housed at High Desert State Prison in Susanville, California. The events giving rise to the claims at issue in this action allegedly occurred at the California Substance Abuse Treatment Facility (SATF) in Corcoran, California, when Plaintiff was incarcerated there for five months, from March 18, 2005 until August 23, 2005. Plaintiff claims that his outgoing mail was obstructed, and that he was retaliated against for filing inmate grievances and lawsuits, in violation of the First Amendment.

### A.        Interference with Outgoing Mail

Plaintiff alleges that defendants Motty, Pugliese, Smith, Guerrero, Cooper, Garcia, Hall, and Does 1-5 variously delayed his outgoing mail due to issues of Plaintiff's compliance with

---

against Plaintiff for having a clothesline inside his cell, and (6) instructed CDCR personnel at SATF to limit Plaintiff to a sixty-minute non-contact visit with a visitor who had come over 250 miles to see him, were dismissed by the court based on Plaintiff's failure to exhaust remedies before filing suit. (ECF No. 88.) The court also dismissed defendants Meaders, Cuevas, and Johnson from this action, based on Plaintiff's failure to exhaust remedies for the claims against them before filing suit. (Id.) Defendants Does 1-5 have not been sufficiently identified to enable service of process upon them by the United States Marshal. All other claims and defendants, other than those listed above, were dismissed from this action by the court on August 17, 2009, based on Plaintiff's failure to state a claim. (ECF No. 29.)

[2] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion. Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).

[3] Plaintiff's Second Amended Complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence. Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004). The summarization of Plaintiff's claims in this section should not be viewed by the parties as a ruling that the allegations are admissible. The court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections which follow.

indigent mailing requirements/regulations.  (ECF No. 16 at 21-42.)  Plaintiff alleges that on multiple occasions between March and August 2005, Plaintiff placed envelopes in the mail via CDCR personnel at SATF, with a CDCR form 193 trust account withdrawal order for payment of postage, and the envelopes were later returned to him unmailed on the falsely proffered basis that Plaintiff had abused his status as an indigent prisoner by submitting those envelopes without sufficient funds in his trust account to cover postage.  (ECF No. 16 at 28 ¶18.)

Plaintiff also alleges that throughout the five months that he was at SATF, CDCR personnel at SATF, including defendants Does 1-5, Pugliese, and Smith, repeatedly refused and otherwise failed to provide Plaintiff with the indigent correspondence supplies he requested and was entitled to receive.  (ECF No. 16 at 26-27.)  These acts severely hindered Plaintiff in his ability to correspond with others outside the prison.

**B.  Retaliation**

Plaintiff alleges that he was retaliated against by defendants Smith, Adams, Tucker, Sherman, and Selvy for his actions complaining of the conditions and abuses in prison, including filing prisoner grievances and lawsuits.  (ECF No. 16 at 52-54.)  On August 1, 2005, defendant Tucker authored a CDCR form 114-D administrative confinement order falsely alleging that Plaintiff "presents an immediate threat to the safety of self or others" and "endangers institution security," based on false information from Officer Larios [not a defendant].  (ECF No. 16 at 52 ¶127.)  As a result Plaintiff was handcuffed, subjected to an unclothed body search, placed inside a small cage, and taken to administrative segregation, placed inside a cell which has painted over exterior windows, and stripped of all personal property, liberty, and privileges that he had been rightfully enjoying until then, following his arrival at SATF.   On August 2, 2005, defendant Smith arbitrarily retained Plaintiff in administrative segregation, despite the ability to release Plaintiff on that date.  From August 1, 2005, to August 11, 2005, CDCR personnel at SATF, including defendants Sherman and Smith, kept Plaintiff confined in administrative segregation which severely impacted Plaintiff's diagnosed mental condition and caused him to suffer immensely.

///

On August 11, 2005, defendants Sherman, Smith, and Selvy put Plaintiff up for a retaliatory prison transfer.  (ECF No. 16 at 53-54.)  From August 12, 2005 to August 23, 2005, CDCR personnel at SATF continued to house Plaintiff in administrative segregation, and on August 23, 2005, Plaintiff suffered a retaliatory transfer to another prison pursuant to the actions by defendants Sherman, Smith, and Selvy on August 11, 2005.

**III.    SUMMARY JUDGMENT STANDARD**

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendant meets his initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc.,

509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566 (2012).   The court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.   <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## IV.   DEFENDANTS' UNDISPUTED FACTS (DUF)[4]

### _Parties_

1.   Plaintiff Eric K'napp (J-10618) is a state prisoner currently housed at High Desert State Prison in Susanville, California. (Court Record.)  During all times relevant to the matters at issue, K'napp was housed at the California Substance Abuse Treatment Facility (SATF).  (Defendants' Exhibit A, Attachment 1 (DX A-1), declaration of J. Ambrose and documents from K'napp's central file, p. 3-5.)

2.   At all times relevant to this action, Defendant Adams was employed by CDCR as the Warden at SATF.  (Compl., Section III, ¶ 4.)

///

3.   At all times relevant to this action, Defendant Cooper was employed by CDCR as an Appeals Coordinator at SATF.  (Compl., Section III, ¶ 8.)

4.   At all times relevant to this action, Defendant Garcia was employed by CDCR as an Appeals Coordinator at SATF.  (Compl., Section III, ¶ 15.)

5.   At all times relevant to this action, Defendant Hall was employed by CDCR as an Appeals Coordinator at SATF.  (Compl., Section III, ¶ 18.)

///

---

[4] These facts are undisputed for the sole purpose of this motion.  The court has compiled the summary of undisputed facts from Defendants' statement of undisputed facts and Plaintiff's response to Defendant's statement of disputed facts.  (ECF No. 136-1; ECF No. 147-1 at 386.)

6.     At all times relevant to this action, Defendant Motty was employed by CDCR and assigned to the mailroom at SATF.  (Compl., Section III, ¶ 25.)

7.     At all times relevant to this action, Defendant Pugliese was employed by CDCR at SATF as a Correctional Sergeant.  (Compl., Section III, ¶ 29.)

8.     At all times relevant to this action, Defendant Selvy was employed by CDCR as a Classification Services Representative (CSR).

9.     At all times relevant to this action, Defendant Sherman was employed by CDCR at SATF as an Associate Warden.  (Compl., Section III, ¶ 32.)

10.     At all times relevant to this action, Defendant Smith was employed by CDCR at SATF as a Correctional Lieutenant.  (Compl., Section III, ¶ 33.)

11.     At all times relevant to this action, Defendant Tucker was employed by CDCR at SATF as a Correctional Lieutenant. (Compl., Section III, ¶ 36.)

### *Inmate Trust Accounts*

12.     An Inmate Roster Record is created the first time an inmate is admitted.  At that time, control room staff enter the inmate's full name, date of birth, ethnicity, arrival date, and location from which the inmate arrived.   (Defendants' Exhibit B (DX B), Department Operations Manual § 47130.4.)

13.     Penal Code Sections 2085 and 5057 require that the CDCR establish an accounting and auditing system to accurately account for all inmate money and property.  The Inmate Trust Accounting System is designed to:

•Replace outdated bookkeeping machines.

•Automate the bookkeeping functions in the facility's trust office.

• Account for all inmate monies held in trust by the Department.  (DX B.)

14.     Each facility uses the inmate trust account system to perform trust accounting functions.  (DX B.)

15.     The Inmate Trust Accounting System application uses information provided by the Inmate Roster System to identify inmates who have just arrived, transferred out, transferred in, or have been paroled or discharged.   (DX B.) For each new arrival, the Inmate Trust

Accounting System establishes a trust account in which monies shall be held and deposits and withdrawals posted.

16.     The Inmate Trust Accounting System produces monthly statements of account, a general ledger, accounts payable, accounts receivable, a daily balance sheet, audit reports, and preprinted canteen cards.  (DX B.)  The inmate's trust account accounts for inmate monies. (DX B.)

### *Mail Supplies for Indigent Inmates*

17.     Inmate K'napp claims that he is indigent.  (SAC, § IV, ¶ 14.)

18.     An indigent inmate is defined as "an inmate who is wholly without funds at the time they were eligible for withdrawal of funds for canteen purchases."  (Defendants' Exhibit C (DX C), California Code of Regulations title 15, § 3000, Definitions.)

19.     Upon request by an indigent inmate, he shall be given writing paper, and envelopes with the minimum postage required for first class domestic mail for up to five one-ounce letters per week.  (DX D, § 54010.5)

20.     Each housing unit had a list where indigent inmates could request indigent envelopes.  (DX E, ¶ 5.)

21.     To receive their monthly allotment of envelopes, the inmate's name had to be on the list and the list had to be received by the mailroom no later than the 10th of the month.  (DX E, ¶ 5.)

22.     The sign-up sheet was sent from the mailroom to the Accounting Office, where the indigent status of each inmate listed was verified.  (DX E, ¶ 5.)

23.     The list was then returned to the mailroom where the indigent envelopes were bundled for each housing unit.  (DX E, ¶ 5-6.)  The envelopes were then passed out by the housing unit staff.  (DX E, ¶ 6.)

24.     Indigent inmates were provided with free and unlimited mail to any court.  (DX D, § 54010.5.2; DX E, ¶ 7.)

///

///

25.     According to the DOM, a charge was not be placed against future deposits to the inmate's trust account to recover the cost of materials and postage provided while the inmate was indigent.  (DX D, § 54010.5.)

### *Mail Procedures*

26.     Inmates may receive First-Class Mail containing newspaper clippings, internet downloaded articles, photocopies of clippings/articles, or electronic mail (e-mail).  (DX D, § 54010.10.)

### *The Processing of K'napp's Mail*

27.     K'napp arrived at SATF on March 18, 2005.  (DX A, p. 5.)

28.     On April 10, 2005, K'napp filed a grievance claiming that mailroom staff were interfering with his incoming and outgoing mail.  (DX A, p. 19-21.)  According to K'napp, between March 29, 2005, and April 17, 2005, the mailroom had returned "confidential/legal mail."  The informal response noted that the mail was not addressed to any court or to the Board of Control, therefore, the mail was returned for proper postage.  (DX A, p. 19.)

29.     Dissatisfied, K'napp elevated the grievance to the first formal level.  (DX A, p. 19.)  Sergeant Pugliese interviewed K'napp regarding his grievance.  (DX A, p. 23.)  The response noted that K'napp was trying to send out mail by attaching a trust withdrawal slip, but K'napp did not have funds in his account to pay for the postage.  (DX A, p. 23.)  It was again explained to K'napp that his mail did not qualify as the unlimited free postage afforded to indigent inmates because the mail was not addressed to either a court or to the Board of Control.  (DX A, p. 23.)

30.     On May 1, 2005, K'napp filed a grievance claiming that he had signed up for indigent mail supplies, but had not received the items.  (DX A, p. 29-30.)  On June 1, 2005, K'napp submitted the grievance to the first formal level of review, claiming that he had not received a response at the informal level of review.  (DX A, p. 29.)

31.     On June 15, 2005, Sergeant Pugliese sent a memo to the Appeals Office.  (DX A, p. 31.)  Sergeant Pugliese indicated that Building E-3, K'napp's housing unit, had not submitted a sign-up sheet for indigent envelopes for the month of April.  (DX A, p. 31.)

8

Sergeant Pugliese noted that he had asked for a count of the envelopes needed, and had supplied them on an informal basis.  (DX A, p. 31.)

32.    On June 22, 2005, K'napp was interviewed by Sergeant Henson [not a defendant], the housing unit Sergeant, regarding the lack of indigent mail supplies.  (DX A, p. 32.)  Sergeant Henson noted that the housing unit staff would ensure that the sign-up sheet for indigent envelopes would be completed and sent to the mailroom.  (DX A, p. 32.)  On 6/24/05, Lt. Smith gave Plaintiff some sheets of blank Xerox paper, and Plaintiff's signature appears next to the words "120 sheets of paper issued on 6/24/05."  (DX A, p. 32.)

33.    Still dissatisfied, K'napp submitted his grievance to the second level of review, claiming that he had not received all of the items noted.  (DX A, p. 32.)  The appeal was partially granted at the second level.  (DX A, p. 36.)  The response noted that the mailroom had no record of K'napp signing up for indigent mail supplies for the months of March or May 2005.  The response also noted the good faith attempts to rectify the problem, and that K'napp had received indigent envelopes in the months of July and August 2005 based on the sign up sheets for June and July 2005.  (DX A, p. 35-6.)

34.    K'napp submitted his grievance to the Director's level, seeking assurance that the problem would not happen again.  (DX A, p. 32.)  The grievance was denied at the Director's level, with a finding that there had been no wrongdoing on the part of the mailroom staff.  (DX A, p. 37.)

35.    On July 5, 2005, K'napp submitted another grievance again claiming that he had not received indigent mail supplies.  (DX A, p. 39.)

36.    On July 19, 2005, K'napp submitted a grievance assigned log number SATF-E-05-02970 that Sergeant Pugliese and Warden Adams had caused, or allowed, K'napp's incoming, outgoing, confidential, legal, and regular mail to be illegally censored, opened, delayed, and or otherwise obstructed.  (DX A, p. 47.)  The pages attached to the grievance, which described the problem, indicated that K'napp had tried to send mail to an attorney named Lang and to the Inspector General's Office.  (DX A, p. 48-49.)  In addition, K'napp had tried to mail items to Rosen, Bien & Asaro, an attorney named Ravis, the Warden at California State

Prison – Lancaster, an attorney named Young, Legal Services for Inmates with Children, the ACLU, an attorney named Montgomery, the CDCR Director's Office, the King County District Attorney's Office, and the Chief of Inmate Appeals.  (DX A, p. 48-49.)  K'napp also alleged that mail from the Ninth Circuit Court of Appeals and a letter for attorney Ravis had been opened outside of his presence.  (DX A, p. 49.)

37.     Mailroom staff at SATF were advised by the litigation office that K'napp had no pending civil lawsuits.  (DX E, ¶ 13.)  A review of the Public Access to Court Electronic Records (PACER) printout also indicates that K'napp had no active cases in the Federal Courts at that time.  (Defendants' Exhibit G (DX G), PACER listing of K'napp's Federal Court Cases.)

38.      On August 5, 2005, the appeals office notified K'napp that his appeal was not being processed as a staff complaint.  (DX A, p. 50.)

39.     The appeal was bypassed at the informal level of review, and the first level response was issued on August 23, 2005, after K'napp had been transferred.  (DX A, p. 55.)  K'napp was again advised that the mail he was trying to send out without postage did not qualify for unlimited free postage.  (DX A, p. 56-57.)  K'napp was also advised that if he was sending mail to a court, he was required to submit a signed trust withdrawal request.  (DX A, p. 56.)

40.     The first level response also noted that all regular non-confidential mail was subject to be read by designated employees before it is sent or delivered to an inmate.  (DX A, p. 56.) The appeal was then denied at the first level of review.  (DX A, p. 57.)

41.     K'napp submitted his appeal to the second level of review claiming that the first level response failed to address staff misconduct.  (DX A, p. 47.)

42.     The second level response was issued on November 2, 2005, and again K'napp's appeal was denied.  (DX A, p. 58.)  The appeal noted that Appeals Coordinator Hall had investigated K'napp's appeal, and found that the processing of K'napp's mail at SATF had been done in accordance with CDCR's policies and procedures.  (DX A, p. 58.)

///

### *K'napp's Transfer from SATF*

43.   On July 19, 2005, K'napp sent a letter to Warden Adams regarding interactions he had with Officer Larios.  (DX A, p. 77.)  K'napp also advised Warden Adams that he knew Officer Larios' brother.  (DX A, p. 77.)

44.   Under the California Code of Regulations title 15, § 3400, Familiarity, "Employees must not engage in undue familiarity with inmates, parolees, of the family and friends of inmates or parolees.  Whenever there is reason for an employee to have personal contact or discussions with an inmate or parolee or with the family and friends of inmates and parolees, the employee must maintain a helpful but professional attitude and demeanor. Employees must not discuss their personal affairs with any inmate or parolee."

45.   On August 1, 2005, K'napp was issued a lock-up order notifying him that he was being removed from E-Facility and placed into administrative segregation because he had personal knowledge of a Correctional Officer on E-Facility.  (DX A, p. 78.)  K'napp was advised that he would remain in administrative segregation until an investigation into the matter could be completed.  (DX A, p. 78.)

46.   On August 2, 2005, Warden Adams requested that K'napp be transferred to another institution due to K'napp's personal knowledge of a staff member.  (DX F.)

47.   K'napp appeared before the administrative segregation institutional classification committee on August 11, 2005.  (DX A, p. 82.)  The committee recommended that K'napp be referred to the CSR for transfer to Pleasant Valley State Prison (PVSP) with an alternative placement at Salinas Valley State Prison (SVSP).  (DX A, p. 82.)

48.   The CSR, D. Selvy, endorsed K'napp from transfer to PVSP on August 11, 2005.  (DX A, p. 83.)

49.   K'napp was transferred to PVSP on August 23, 2005.  (DX A, p. 5.)

## V.   PLAINTIFF'S UNDISPUTED FACTS

1.   Plaintiff has been confined within the California Department of Corrections and Rehabilitation (hereinafter "CDCR") since 3/17/94.  (Pl. Decl. & Exhs. ¶4.)

///

11

2.      Between July 1998 and 3/18/05, Plaintiff jointly, individually, and otherwise personally participated in protected exercise of First Amendment rights toward, against, and otherwise concerning the CDCR and multiple CDCR prisons, employees, customs, policies, practices, and conditions.  (Id. ¶¶ 14-23, 82-93.)

3.      On 3/18/05, the CDCR transferred Plaintiff to one of its state prisons in Corcoran (hereinafter "SATF").  (Id. ¶ 6.)

4.      Following his arrival at SATF, Plaintiff further participated in joint, individual, and otherwise personal exercise of First Amendment rights toward, against, and otherwise concerning the CDCR and CDCR prisons, employees, customs, policies, practices, and conditions, including with respect to his confinement at SATF.  (Id. ¶¶ 24-81, 82-94.)

5.      Each of the defendants in this action had reason and the means to know, should have known, and in fact did know of the protected exercise of First Amendment rights that Plaintiff had jointly, individually, and otherwise personally participated in prior to and following his arrival at SATF on 3/18/15.  (Id. ¶¶ 308-314.)

6.      All through the five months that followed Plaintiff's arrival at SATF in 2005, CDCR employees, including Defendants Adams, Cooper, Garcia, Guerrero, Hall, Motty, and Pugliese, caused Plaintiff's outgoing confidential correspondence to repeatedly be returned to him unmailed and otherwise obstructed contrary to and in violation of the CDCR's governing policies and procedures that were in effect at the time.  (Id. ¶¶ 95-299.)

7.      During the period of 8/1/05 to 8/23/05, CDCR employees, including Defendants Adams, Selvy, Sherman, Smith, and Tucker, retaliated against Plaintiff for the protected exercise of First Amendment rights that he had jointly individually, and otherwise personally participated in prior to and following his arrival at SATF by causing him to be and remain confined in ad-seg, transferred to another prison, and transferred to a prison located far away from Sacramento, all under false pretenses and otherwise contrary to and in violation of the CDCR's governing policies and procedures that were in effect at the time.  (Id. ¶¶ 303-404.)

///

///

## VI.   INTERFERENCE WITH OUTGOING MAIL – FIRST AMENDMENT CLAIM

### A.   Legal Standards

#### 1.   Interference With Outgoing Mail

Prisoners have "a First Amendment right to send and receive mail." Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam). "The standards for evaluation of a First Amendment claim concerning outgoing correspondence sent by a prisoner to an external recipient were established by the Supreme Court in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 413–14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)." Barrett v. Belleque, 544 F.3d 1060, 1062 (9th Cir. 2008). "Under these standards, censorship of prisoner mail is justified only if 'the regulation or practice in question [ ] further[s] an important or substantial governmental interest unrelated to the suppression of expression' and 'the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved.'" Id. (quoting Thornburgh, 490 U.S. at 413); Lewis v. Casey, 518 U.S. 343, 361, 116 S.Ct. 2174 (1996) ("[A] prison regulation impinging on inmates' constitutional rights is valid if it is reasonably related to legitimate penological interests." (internal quotations omitted)). Prison officials do not need to show that there is no less restrictive mail policy that could serve the same penological interests. See Thornburgh, 490 U.S. at 412; Witherow, 52 F.3d at 265.

Challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system. Pell v. Procunier, 417 U.S. 817 (1974). Prison officials must show that "a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation." Procunier, 416 U.S. at 413. "Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad." Id. at 413-14. As a rule, the courts closely examine the fit between asserted penological interest and the particular outgoing mail being censored, rather than accept at face-value an assertion by prison officials that the confiscation serves security or

13

rehabilitation interests.   Woodard v. Haviland, No. 2:11-CV-1807 LKK JFM, 2013 WL 753458, at *7 (E.D. Cal. Feb. 26, 2013) report and recommendation adopted in part, rejected in part, No. CIV. S-11-1807 LKK, 2013 WL 5305759 (E.D. Cal. Sept. 19, 2013).   Because a balancing of those rights and interests requires the parties to make an evidentiary showing as to their positions, the court is not in a position to make a determination at the pleading stage. Barrett, 544 F.3d at 1062.  Isolated incidents of mail interference or tampering will not support a claim under section 1983 for violation of plaintiff's constitutional rights.  See Davis v. Goord, 320 F.3d 346, 351 (2d. Cir. 2003); Gardner v. Howard, 109 F.3d 427, 431 (8th Cir. 1997); Smith v. Maschner, 899 F.2d 940, 944 (10th Cir. 1990).

### 2. California Department of Corrections and Rehabilitation (CDCR) Inmate Mail Processing

The court takes judicial notice of the fact that the State of California has enacted policy to provide for the "orderly processing of inmate mail and to give direction to staff, inmates, and their correspondents concerning facility mail requirements."  Cal.Code Regs. tit. 15 §3130, et seq.  Under section 3131, each warden is to prepare and maintain a plan of operations for the sending and receiving of mail for inmates housed in the facility.

At the time of the events giving rise to this action, Title 15 of the California Administrative Code[5] provided, in relevant part, that:

**§ 3000 (2005) *Definitions***

Indigent Inmate means an inmate who is wholly without funds at the time they were eligible for withdrawal of funds for canteen purchases.

**§ 3132 (2005) *Responsibility and Compliance*.**

. . . Violation of . . . approved facility mail procedures may result in the temporary suspension or denial of correspondence between the persons involved.

**§ 3134 (2005) *Indigent Inmates*.**

Writing paper, envelopes, and the minimum postage required for first class domestic mail for up to five one ounce letters per week shall be supplied to an indigent inmate as defined in section 3000, upon the

---

[5] Also known as California's Code of Regulations, Cal.Code Regs., and CCR.

inmate's request.  An indigent inmate shall have free and unlimited postage for the mailing of claims to the Board of Control and for the filing of legal documents to any court as described in section 3165. . . A charge will not be placed against future deposits to the inmate's trust account to recover the costs of materials and postage provided while the inmate was without funds.

**§ 3136 (2005)** *Disapproval of Inmate Mail*

(a) Staff shall not permit an inmate to send or receive mail which, in their judgment, has any of the characteristics listed in Section 3006(c) [Contraband].

(b) Such mail shall be referred to a staff member not below the level of facility captain.  Disapproved outgoing mail shall be processed in accordance with subsection 3147(a)(6).

**§ 3138 (2005)** *General Mail Regulations*.

(a) All nonconfidential inmate mail is subject to being read in its entirety or in part by designated employees of the facility before it is mailed for or delivered to an inmate.  The institutional head or designee may reject mail sent by or to an inmate as provided in section 3136.

(c) Outgoing inmate mail shall be inspected in accordance with local procedures.

**§ 3141 (2005)** *Confidential Correspondence*.

(a) Confidential correspondence means that the correspondence shall not be read by any employee except as prescribed in Section 3142.

(c) Inmates and persons confined in departmental facilities may correspond confidentially with the persons or the staff members of the following persons:

(1) all state and federal elected officials,

(2) all state and federal officials appointed by the governor or the President of the United States,

(3) All city, county, state and federal officials having responsibility for the inmate's present, prior or anticipated custody, parole or probation supervision.

(4) County agencies regarding child custody proceedings, as clearly identified in the communication.

(5) All state and federal judges and courts.

(6) An attorney at law listed with a state bar association.

(7) The director, chief deputy director, deputy directors, assistant directors, executive assistant to the director, and the chief, inmate appeals, of the Department of Corrections.

(8) Legitimate legal service organizations including, but not limited to: the American Civil Liberties Union, the Prison Law Office, the Young Lawyers Section of the American Bar Association, and the National Association of Criminal Defense Lawyers.

§3142 (2005) *Processing of Outgoing Confidential Mail*

In order to be accepted and processed as confidential correspondence, an inmate's letter must comply with . . . the following requirements:

(a) The letter must be addressed to a person or to the office of a person listed in Section 3141.

(b) the inmate's name and address of the facility must be included in the return address appearing on the outside of the envelope.

(c) The word "confidential" must appear on the face of the envelope.  Failure to do this will result in the letter being processed as regular mail or being returned to the inmate if for any reason the mail cannot be processed as regular mail.

(d) Approved facility mail procedures may require either of the following procedures:

(1) The envelope must be sealed by the inmate before it is turned over to a staff member for mailing; or

(2)  The envelope must be sealed by the inmate in the presence of a designated staff member before it is accepted for mailing.

§3147 (2005) *Definition and Disposition of Mail*

(a) All incoming and outgoing mail shall be handled in accordance with the following:

(6) Stopped Mail.
If for any reason set forth in this article or in approved facility mail procedures any first or second class mail is not accepted for mailing for an inmate or is accepted for mailing but is not promptly mailed, the inmate will be notified in writing of the reason for refusal to accept or to promptly mail the items. . . Unless the retention of such mail is required in legal or disciplinary proceedings against the inmate it will be promptly mailed or returned to the inmate.

§3165 (2005) *Mailing Legal Documents*.

(a) . . . Mail designated by the inmate as legal mail will be delivered to the facility mail room for inspection, pursuant to Sections 3144 [Inspection of Confidential Mail] and 3145 [Enclosures in Confidential Mail], and mailing in accordance with local facility mail procedures.

(b) With each transmittal of mail to a court or claim filed with the BOC requiring the addition of postage, the inmate must submit a signed CDC Form 193, Trust Account Withdrawal Order. The mail room will remove the trust account withdrawal order, enter the amount of postage required, and forward the order to the trust office for processing. Mail addressed to a court or claims addressed to the BOC will be posted on the inmate's CDC Form 119, Mail Record.

(d) The cost of postage for mailing documents to the courts will be charged against an inmate's trust account unless the inmate is without funds at the time the material is submitted for mailing and remains without funds for 30 days after the documents are mailed.

## B.   <u>Defendants' Motion</u>

Defendants argue that they did not refuse to process or intentionally delay Plaintiff's outgoing mail, but rather, required Plaintiff to abide by CDCR's outgoing mail policies. Defendants argue that mail submitted for mailing by Plaintiff did not have postage attached and was returned to Plaintiff with instructions on the proper process for sending mail.  Defendants argue that Plaintiff's mail did not qualify for free postage, and although Plaintiff attached a form authorizing funds to be charged to his trust account, there were no funds in Plaintiff's trust account to pay for postage. Defendants also argue that Plaintiff's mail may have been "confidential" under pertinent regulations, but it was not "legal" mail and thus not entitled to state-paid postage.

Defendants cite 15 CCR § 3134, as in effect in 2005, which provides that indigent inmates were entitled to state-paid postage for five letters per week plus unlimited postage for mailing claims to the Board of Control or filing legal documents to any court.  Under §§ 3141 and 3142, an inmate's confidential mail shall not be read by any correctional staff and shall either be sealed by the inmate or by a staff person in the inmate's presence.  Under §3141(c), confidential mail included mail sent to attorneys and state elected officials.   Under the regulations, postage shall be provided for indigent inmate legal/confidential mail that is directed to the Board of Control (BOC), any state or federal court, any person or party required to be served per applicable court rules, the inmate's attorney, any person named in the lawsuit, the Attorney General's Office, Director's Office, and Department contract counsel.

///

Defendants' evidence includes documents from Plaintiff's inmate central file (ECF No. 136-3, Exh. A), pages from the CDCR's Department Operations Manual (DOM) and the California Code of Regulations (Id., Exhs. B-D), Sergeant C. Pugliese's Declaration (Id., Exh. E), and records from PACER (Public Access to Case Electronic Records) (Id., Exh. G).

Defendants provide evidence that the mailroom contacted the Litigation Office and they were advised that Plaintiff had no active lawsuits at that time.  (DUF 37.)   Moreover, a review of the PACER website indicates that Plaintiff had no active cases at that time.   (Id.) Defendants argue that therefore, Plaintiff was not entitled to free postage to notify a person or party being served.   Defendants provide a copy of the PACER printout in support of their argument that there was no indication in any of the PACER records that Plaintiff on the printout was represented by any of the attorneys he was trying to contact by mail.  (Deft's Exh. G, ECF No. 136-3 at 21-22.)   Defendants conclude that Plaintiff was not entitled to free postage, arguing that the relevant policies and procedures required that Plaintiff use his allotment of postage paid envelopes when corresponding with his attorney or any other confidential correspondents.   Defendants argue that under Bounds v. Smith,[6] the regulations and policy were consistent with the Constitution and provided that certain specific legal mail was entitled to state-paid postage if the sender was indigent.   Defendants argue that other mail was not entitled to state-paid postage, although an inmate could use one of his five allotted state-paid letters to mail it.   These rules did not prevent Plaintiff from sending mail, they merely required that Plaintiff either pay for the postage or use one of his five allotted free letters.   Defendants assert that while Plaintiff argues that the individuals he sent letters to were "involved in" his litigations, he has not provided any evidence that any individual was acting as his attorney, or was a party to any lawsuit he had filed (and thus that his mail was "legal" mail entitled to state-paid postage).

///

---

[6] Bounds v. Smith, 430 U.S. 817, 824-25 (1977) (holding that states must provide indigent prisoners with stamps to mail legal documents).

Defendants argue that letters sent to state officials and attorneys not representing the inmate are not "legal mail" as defined by the courts.  Instead, pursuant to <u>Wolff v. McDonnell</u>[7] and <u>Keenan v. Hall</u>,[8] "legal mail" in the context of the First Amendment generally applies to correspondence between a prisoner and his attorney, or mail sent from a prisoner to a court.  Pursuant to CDCR's policies, indigent inmates are also allowed to send mail to the Office of the Attorney General or to the Board of Control at state expense.  (DUF No. 24.)

With respect to Plaintiff's claim that Defendants refused to provide him with the allotment of indigent mail supplies to which he was entitled, Defendants argue that they were not somehow censoring Plaintiff's mail, but that other circumstances caused a failure to provide the mail supplies.  Defendants argue that Plaintiff's claims that they somehow censored Plaintiff's mail are not supported by any specific facts or corroborating evidence.  Instead, the evidence shows that Plaintiff was not provided with indigent envelopes in March because he was not transferred to SATF in time to receive that month's allotment.  (Decl. of Pugliese, Doc. 136-3 at 15 ¶5.)  When the error was found, staff tried to make it right by providing Plaintiff with twenty metered envelopes.  (DUF No. 32.)

The court finds that Defendants have met their burden to come forward with evidence that establishes a lack of existence of a triable issue of fact as to whether they improperly censored Plaintiff's outgoing mail when they refused to mail it, and as to whether they improperly censored Plaintiff's mail when they failed to provide him with indigent inmate mail supplies.  The burden now shifts to Plaintiff to show that Defendants improperly censored Plaintiff's mail.

## C.   **Plaintiff's Opposition**

Plaintiff argues that Defendants caused his outgoing confidential mail to be repeatedly returned to him unmailed and otherwise obstructed, contrary to and in violation of the CDCR's governing policies and procedures that were in effect at SATF in 2005.  Plaintiff also argues

---

[7] <u>See</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539, 574-76 (1974).

[8] <u>Keenan v. Hall</u>, 83 F.3d 1083, 1094 (9th Cir. 1996).

that CDCR employees at SATF repeatedly denied him indigent envelopes in violation of the CDCR's governing policies and procedures.

Plaintiff's evidence includes his verified Declaration of January 11, 2015 and its Exhibits. (ECF No. 147 at 31-125, Exhs. A-E at ECF No. 147 at 126-411, Exhs. F-S at ECF No. 147-1 at 1-163; ECF No. 147-1 at 238-412.) Plaintiff also filed a Statement of Disputed Facts with evidence of some of Defendants' discovery responses attached. (ECF No. 147-1 at 165-236, Attachments 1-11 at ECF 147-1 at 237-384.)

With respect to Plaintiff's claim that Defendants failed to provide him with the mail supplies he was entitled to, Plaintiff's evidence shows the following. Title 15 of the California Code of Regulations, and the CDCR's Department Operations Manual (DOM) governed SATF in 2005. (Pltf's Decl., ECF No. 147 at 50-51 ¶¶95-100.) Plaintiff was an indigent inmate as defined by CDCR policies and procedures, and was therefore entitled to request and receive free writing paper, envelopes, and postage sufficient to mail five 1 oz. letters per week. (Id. at 57-58 ¶¶104, 106.)

Plaintiff arrived at SATF on March 18, 2005. (DUF No. 27.) On March 25, 2005, Plaintiff requested 20 indigent envelopes for the upcoming month of April, and SATF staff failed to provide him with them. (Pltf's Decl., ECF No. 147 at 58 ¶¶108, 109.) On May 1, 2005, Plaintiff filed an inmate grievance complaining that he had not received the envelopes. (Id. at 59 ¶¶114.) On May 3, 2005, Plaintiff finally received the envelopes for the month of April. (Id. ¶117.) Plaintiff chose not to sign up for more envelopes for May. (Id. ¶118.)

On May 25, 2005, Plaintiff requested 20 indigent envelopes for the month of June, and SATF staff failed to provide him with them. (Id. at 58 ¶¶110, 111.) On July 5, 2005, Plaintiff filed an inmate grievance complaining that he had not received the envelopes. (Id. at 59 ¶115.) On July 22, 2005, Plaintiff finally received the envelopes for the month of June. (Id. ¶119.) Plaintiff chose not to sign up for more envelopes for August. (Id. at 60 ¶120.)

On June 25, 2005, Plaintiff requested 20 indigent envelopes for the month of July, and SATF staff failed to provide him with them. (Id. at l58-59 ¶¶112, 113.) On August 4, 2005, Plaintiff filed an inmate grievance complaining that he had not received the envelopes. (Id. at

59 ¶116.)  On August 19, 2005, Plaintiff finally received the envelopes for the month of July. (Id. at 60 ¶121.)  This was only the third time he received any indigent envelopes since his arrival at SATF on March 18, 2005.  (Id. ¶124.)

With respect to Plaintiff's claim that Defendants obstructed his outgoing mail, Plaintiff's evidence shows as follows.  Plaintiff arrived at SATF on March 18, 2005.  (DUF No. 27.)  During Plaintiff's confinement at SATF, he was a plaintiff class member of three class action cases, and therefore represented by counsel at the Prison Law Office in San Quentin, California, and the law firm of Rosen, Bien, Galvan, Asaro, and Grunfeld in San Francisco. (Pltf's Decl., ECF No. 147 at 48 ¶¶82, 83, 84, and Exh. A at 1-8.)  Plaintiff also prosecuted and maintained several state habeas corpus actions, and attorney misconduct proceedings at the California State Bar, and was represented in one of the habeas corpus actions by attorney Mark Ravis.  (Id. at 49-50 ¶¶85-94, and Exh. A at 31-32.)  Plaintiff notified prison officials about his pending cases when he arrived at SATF.

On March 20, 2005, Plaintiff submitted 19 envelopes of outgoing confidential mail to a guard at SATF.  (Id. at 60 ¶127.)  The mailroom withheld 8 of the envelopes and returned them unmailed to Plaintiff with a memo informing him that he was not entitled to free postage for the 8 envelopes under CCR Title 15 Section 3134.  (Id. at 61 ¶ 132 & Exh. G (ECF No. 147-1 at 42.))  The 8 envelopes were addressed to (1) Plaintiff's attorney Mark Ravis,[9] (2) Plaintiff's attorney(s) at Rosen, Bien, etc.,[10] (3) attorney Robert Young, (4) attorney Cheryl Montgomery, (5) Chief of the Regulation and Policy Management Branch at the CDCR Director's Office, (6) Warden at the prison in Lancaster regarding pending litigation, (7) the American Civil Liberties Union, and (8) an organization called Legal Services for Prisoners with Children.  (Id. at 61 ¶128.)  With the 19 envelopes, Plaintiff included a fully-completed CDC-193 Trust Account Withdrawal Order, so postage could be charged against his trust account and put onto each

_____

[9] Plaintiff declares that he commenced a state habeas action in November 2004 that was pending until October 2005, and was represented by attorney Mark Ravis.  (ECF No. 147 at 50 ¶¶92-93 and Exh. A at 31-32.)

[10] Plaintiff declares that he has been a Plaintiff class member in three ongoing federal civil cases since January 1997, and is represented by counsel at the Prison Law Office in San Quentin, California, and at the law firm of Rosen, Bien, Galvan, Asaro, and Grunfeld in San Francisco. (ECF No. 147 at 48 ¶¶82-84.)

envelope pursuant to the CDCR's governing policies.  (Id. ¶129.)  From 3/21/05 until 4/1/05, defendants Guerrero, Motty, and Pugliese withheld the envelopes and failed to immediately notify Plaintiff that the envelopes were not being mailed out.  (Id. ¶131.)  On 4/3/05, Plaintiff wrote a letter to Warden Adams, and included the 8 obstructed envelopes, complaining about how his mail had been interfered with by the SATF mailroom staff.  (Id. at 62 ¶¶135, 136.)  Warden Adams ignored the letter and held the letters for 10 days before returning them unmailed to Plaintiff.  (Id. at 63 ¶141.)  Plaintiff filed at least 5 inmate 602 appeals between 4/10/05 and 7/19/05 concerning mail issues.  (Id. at 64 ¶145.)

On March 22, March 29, April 3, April 10, April 12, April 19, April 21, May 3, June 28, and August 14, 2005, Plaintiff attempted to send confidential/legal mail in the same manner as on March 20, 2005, with similar obstruction by mailroom staff and Defendants, to Rosen, Bien, et al., the CDCR Inspector General at the California Department of Justice, a California Court of Appeal, California Superior Courts, the California Attorney General's Office, the Warden and appeals coordinator at the prison in Lancaster, the Inmate Appeals Branch at the CDCR Director's Office, the Kings County District Attorney, and the CDCR Director's Office, all which concerned pending litigation.  (Id. at 66-95, ¶¶151-299.)  It was not until 5/4/05 that Plaintiff received and used one of the indigent envelopes to send mail from 3/29 and 4/6 to his attorneys at Rosen, Bien, et al.  (Id. at 73 ¶191.)  On May 3, 2005, Plaintiff stapled three of the very first indigent envelopes he received at SATF to an envelope containing the outgoing confidential correspondence that he had submitted for mailing to the CDCR Director's Office on 4/10/05 and 4/17/05.  (Id. at 79 ¶224.)  Upon receiving the envelope, defendants Guerrero, Motty, and Pugliese unlawfully opened the envelope outside of Plaintiff's presence, removed the three attached indigent envelopes, and held his correspondence for more than two weeks before returning it unmailed to Plaintiff, with notice that an additional $.87 postage was due. (Id. at 80 ¶¶225-226 & Exh. K (ECF No. 147-1 at 84.))  Plaintiff asserts that as a result of the obstruction of his outgoing mail, he was forced to commit misconduct by soliciting other prisoners for stamps in violation of 15 CCR § 3192, and he suffered emotional distress and sleeplessness.

### D.   <u>Discussion</u>

### 1.   <u>Outgoing Mail</u>

The material facts are undisputed as to the course of events at issue and the mail procedures that Defendants followed during the events at issue.  The parties do not dispute the following:  Plaintiff arrived at SATF on March 18, 2005.  (DUF No. 27.)  Plaintiff was an indigent inmate without any funds available in his prison trust account.  (DUF Nos. 17, 18.)  As an indigent inmate, Plaintiff was entitled to free and unlimited mail to any court.  (DUF No. 24.)  On April 10, 2005, K'napp filed a grievance claiming that mailroom staff were interfering with his incoming and outgoing mail.  (DUF No. 25.)  According to K'napp, between March 29, 2005, and April 17, 2005, the mailroom had returned outgoing "confidential/legal mail" to him unmailed.  (<u>Id.</u>)  The informal response noted that the mail was not addressed to any court or to the Board of Control and therefore, the mail was returned for proper postage.  (<u>Id.</u>)  Dissatisfied, K'napp elevated the grievance to the first formal level.  (DUF No. 29.)  Sergeant Pugliese interviewed K'napp regarding his grievance.  (<u>Id.</u>)  The response at the first formal level noted that Plaintiff was trying to send out mail by attaching a trust withdrawal slip, but Plaintiff did not have funds in his account to pay for the postage.  (<u>Id.</u>)  It was again explained to Plaintiff that his mail did not qualify for the unlimited free postage afforded to indigent inmates because the mail was not addressed to either a court or to the Board of Control.  (<u>Id.</u>)  Plaintiff also attempted to send mail to an attorney named Lang, the Inspector General's Office, Rosen, Bien & Asaro, an attorney named Ravis, the Warden at California State Prison–Lancaster, an attorney named Young, Legal Services for Inmates with Children, the ACLU, an attorney named Montgomery, the CDCR Director's Office, the King County District Attorney's Office, and the Chief of Inmate Appeals.  (DUF No. 36.)  Mailroom staff at SATF were advised by the litigation office that Plaintiff had no pending civil lawsuits, and a review of the Public Access to Court Electronic Records (PACER) printout also indicates that Plaintiff had no active cases in the Federal Courts at that time. (DUF No. 37.)  Plaintiff was advised during responses to his inmate appeals that the mail he was trying to send out without postage did not qualify for unlimited free postage, that if he was sending mail to a court he was required

to submit a signed trust withdrawal request, and that all regular non-confidential mail was subject to being read by designated employees before it is sent.  (DUF Nos. 39, 40.)   The parties do not disagree that Defendants were following certain established mail procedures.

Plaintiff argues that Defendants' mail procedures violated California's Code of Regulations and the CDCR's Department Operations Manual.[11]  A violation of state regulation does not in itself raise a federal question.  Yang v. Rowland, 867 F.2d 614 (9th Cir. 1989).

The court finds that Defendants' procedures were based on the regulations and the DOM in effect as understood by Defendants. Defendants relied on § 3134 (2005) ("Writing paper, envelopes, and the minimum postage required for first class domestic mail for up to five one ounce letters per week shall be supplied to an indigent inmate . . , upon the inmate's request") when they advised Plaintiff to use his postage-paid envelopes for non-legal mail while he was indigent.  Defendants relied on § 3134 (2005) ("an indigent inmate shall have free and unlimited postage for the mailing of claims to the Board of Control and for the filing of legal documents to any court") when they refused to supply postage to Plaintiff's outgoing mail which was not addressed to the BOC or any court, or for mail which they determined was not for the filing of legal documents to a court.  Defendants relied on § 3134 (2005) ("A charge will not be placed against future deposits to the [indigent] inmate's trust account to recover the costs of materials and postage provided while the inmate was without funds") when they refused to provide free postage for Plaintiff's "confidential" mail while Plaintiff was indigent. Defendants relied on §3142(a) (2005) ("In order to be accepted and processed as confidential correspondence, an inmate's letter must . . . be addressed to a person or to the office of a person listed in Section 3141") when they determined that Plaintiff's mail was not "confidential" correspondence.  Defendants relied on §3165 (2005) ("With each transmittal of mail to a court

---

[11] Plaintiff and Defendants have each submitted as evidence pages taken from the DOM.  (ECF No. 136-3, Exhs. B & D; ECF No. 147, Exh. B at 1-41.)  The court finds that neither of the DOM versions cited could have been the version effective in 2005, because both versions include sections that are referred to as "revised" or "effective" after 2005.  (ECF No. 136-3 at 6; ECF No. 147 at 280, 288.)  The two versions relied upon by the parties are markedly different.  Nevertheless, the DOM sections concerning inmate trust accounts, mail supplies for indigent inmates, and mail procedures in both versions are not materially different for purposes of this motion.

or claim filed with the BOC requiring the addition of postage, the inmate must submit a signed CDC Form 193, Trust Account Withdrawal Order") when they advised Plaintiff of the requirement to submit a trust account withdrawal form with his outgoing "legal" mail.

Plaintiff argues that Defendants refused to provide free and unlimited postage to mail which Plaintiff asserts was for his pending class actions, pending habeas corpus cases, and to attorneys representing him in those cases.  Defendants relied on a definition of "legal mail," which they determined was limited to mail for active cases, and they contacted the Litigation Office and were advised that Plaintiff had no active lawsuits at that time.  They also reviewed the PACER website, which indicated that Plaintiff had no active federal cases, and found no evidence that Plaintiff was represented by counsel in a case where he needed to serve documents in accordance with court rules.  Plaintiff does not provide evidence that his outgoing mail was for active cases, or that he needed to serve documents in accordance with court rules.  Defendants acknowledge that postage shall be provided to indigent inmates for correspondence to the courts or the parties and other persons required to be served in litigation per applicable court rules, which may include the AG's Office, the inmate's attorney(s), persons named as a defendant in the law suit, and the Director's Office.  However, Defendants maintain that only mail to the courts and for claims to the BOC were entitled to "free and unlimited postage," and Plaintiff was to use his allotment of postage-paid envelopes for other mail.

It is undisputed that the mail procedures used by Defendants resulted in the obstruction of Plaintiff's outgoing mail.  Plaintiff argues that such obstruction violated his First Amendment right to send mail.  However, such obstruction, or even censorship of a prisoner's outgoing mail is justified if the procedures being followed by Defendants furthered "an important or substantial governmental interest unrelated to the suppression of expression[, and] the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved."  Procunier, 416 U.S. at 414; accord Barrett, 544 F.3d at 1062.  Defendants "must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation."  Id.  A restriction on inmate correspondence that furthers an important or

substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.  Id.  However, prison administrators are not "required to show with certainty that adverse consequences would flow from the failure to censor a particular letter." Id.

Here, the regulations and procedures at issue entitled indigent inmates to free and unlimited postage for legal mail, but not for other mail.  Indigent inmates were also entitled to an allotment of twenty postage-paid envelopes per month, upon their request, which they could use for legal, confidential, or regular mail.

Defendants argue that prisons have a legitimate interest in controlling the amount of postage they provide to indigent inmates.  Defendants cite Semeneck v. Ahlin, No. 1:09-cv-00566-JLT-PC, 2010 WL 4738065 at *16 (E.D.Cal Nov. 16, 2010) and Rodriguez v. Stone, No. 1:06-cv-00663-OWW-SMS-PC, 2007 WL 4287818 at *3 (E.D.Cal. Dec. 6, 2007) (an inmate does not have a constitutional right to free postage simply because he is sending documents to court, public officers or lawyers) and Shock v. Vonbiela, No. C-93-3371 MHP, 1994 WL 442831 at *2-5 (N.D.Cal. Aug. 2, 1994) (granted summary judgment to defendant correctional officer of plaintiff's allegations that the officer refused to provide state-paid postage for plaintiff's letters to a senator).  Defendants also argue that Plaintiff's claims that Defendants somehow refused to send out his mail for improper reasons is not supported by any specific facts or corroborating evidence.

One of the primary functions of government is the maintenance of orderly penal institutions.  Based on the foregoing, the court finds that the mail procedures followed by Defendants, which are based on California's regulations and CDCR's, DOM furthered the substantial governmental interest of internal order.  The primary goal of the mail policy, as stated by the CDCR, is to provide for the "*orderly* processing of inmate mail."  Cal.Code Regs. tit. 15 § 3130 (emphasis added).  Each warden is to prepare and maintain a plan of operations for the sending and receiving of mail for inmates housed in the facility.  § 3131.  Courts have found prison mail procedures requiring payment of postage to be Constitutional.  Rodriguez, 2007 WL 4287818, at *3 (an inmate does not have a constitutional right to free postage simply

because he is sending documents to court, public officers or lawyers); <u>Bach v. Coughlin</u>, 508 F.2d 303, 307–08 (7th Cir.1974) (regulations of mail "are a reasonable attempt to balance the right of prisoners to use the mails with prison budgetary considerations").   The court does not find the prison's mail procedures to be greater than is necessary to protect the orderly processing of inmate mail.

Moreover, [t]raditionally, federal courts have adopted a broad hands—off attitude toward problems of prison administration." <u>Procunier</u>, 416 U.S. at 404.   "Courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform, . . . [and] where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." <u>Id.</u> at 405.

Plaintiff's own appeals forms reveal that he was informed that some of his mail could not be sent out as legal mail, but instead must be sent as confidential or regular mail, such that he must provide postage.   Plaintiff had the alternative to send the mail out with his twenty postage-paid envelopes allotted per month.   Therefore, the court finds no genuine triable issue of fact for trial, and Defendants are entitled to judgment as a matter of law on Plaintiff's claim that his outgoing mail was censored.

## 2.   **Indigent Mail Supplies**

The parties agree that prison officials at SATF temporarily failed to supply Plaintiff with the mail supplies to which he was entitled as an indigent inmate under 15 CCR § 3134. The following is undisputed.   On March 18, 2005, Plaintiff arrived at SATF, and on May 1, 2005, he filed a 602 appeal placing SATF officials on notice that he had signed up for indigent mail supplies but had not received any.   Plaintiff was an indigent inmate as defined in 15 CCR § 3000, and thus entitled to "[w]riting paper, envelopes, and the minimum postage required for first class domestic mail for up to five one ounce letters per week, upon his request." 15 CCR § 3134.   A procedure was in place at SATF to provide indigent inmates with their allotment of monthly envelopes and postage.   Each housing unit was required to have a list where indigent inmates could request indigent envelopes.   To receive their monthly allotment, the inmate's

///

27

name had to be on the list and the list had to be received by the mailroom no later than the 10th of each month.

Plaintiff provides evidence that he requested monthly allotments of envelopes on March 25, May 25, and June 25, 2005, and each time, staff failed to provide them until after he filed a grievance. Defendants' evidence indicates that there were "many complaints [by inmates] for indigent envelopes for April," and after Sergeant Henson interviewed Plaintiff on June 22, 2005, Henson noted that the housing unit staff would ensure that the sign-up sheet would be completed and sent to the mailroom. (ECF No. 136-2 at 32; DUF No. 32.) Defendants acknowledge that Plaintiff's housing unit failed to submit a sign-up sheet for the month of April. (ECF No. 136-2 at 32, DUF No. 31.) Defendants made good faith attempts to rectify the situation. (DUF No. 33.) Plaintiff also provides evidence that he was not provided writing paper as required by § 3134. (ECF No. 147 at 397-404, Exh. E.)

The court finds the prison's delays in providing Plaintiff with indigent mail supplies during the five months that he was housed at SATF to be isolated incidents of interference with his ability to send mail. Evidence shows that Plaintiff received his April allotment of envelopes on May 3, 2005, decided not to request an allotment for May, received his June allotment on July 22, 2005, received his July allotment on August 19, 2005, and decided not to request an allotment for August. Plaintiff could have requested 20 envelopes for May and August but chose not to. Evidence shows that the delays in providing envelopes to indigent inmates were not limited to Plaintiff only, and there is no evidence that Defendants attempted to censor Plaintiff's mail. Defendants provide evidence that circumstances other than censorship, including negligence by staff caused a failure to provide inmates with mail supplies, and that measures were taken to resolve the problem. Defendants' failure to supply Plaintiff with writing paper was similarly corrected. These intermittent delays in Plaintiff receiving indigent mail supplies do not rise to the level of a First Amendment violation.

Based on the foregoing, the court finds no triable issue of fact, and Defendants are entitled to judgment as a matter of law on Plaintiff's First Amendment claim that Defendants failed to provide him with his allotments of indigent mail supplies.

# VII.   RETALIATION – FIRST AMENDMENT CLAIM

## A.   Legal Standards

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a 1983 claim.  Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985); see also Valandingham v. Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); accord Watison v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012); Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).

An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support a claim under section 1983.  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).  Exercise of First Amendment rights in bringing and assisting in civil rights litigation is also sufficient to support a section 1983 claim.  Rizzo, 778 F.2d at 532.  "The adverse action need not be an independent constitutional violation [and in fact] the mere *threat* of harm can be an adverse action."  Watison, 668 F.3d at 1114.  "[T]he plaintiff must allege a causal connection between the adverse action and the protected conduct[, but b]ecause direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal."  Id.  "Timing can properly be considered as circumstantial evidence of retaliatory intent."  Pratt, 65 F.3d at 808.  "[T]he proper First Amendment inquiry asks "whether an official's acts would chill *or* silence a person of ordinary firmness from future First Amendment activities."  Rhodes, 408 F.3d at 568-69.  "[T]he plaintiff must allege 'that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution...,' [and a] plaintiff successfully pleads this element by alleging, in addition to a retaliatory motive, that the defendant's actions were arbitrary and capricious,' Rizzo, 778 F.2d at 532, or that they were 'unnecessary to the

maintenance of order in the institution,' <u>Franklin v. Murphy</u>, 745 F.2d 1221, 1230 (9th Cir. 1984)." <u>Watison</u> at 1114-15.  The court must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." <u>Pratt</u>, 65 F.3d at 807 (9th Cir. 1995) (quoting <u>Sandin v. Conner</u>, 515 U.S. 472, 482 (1995)).  The burden is on Plaintiff to demonstrate "that there were no legitimate correctional purposes motivating the actions he complains of." <u>Pratt</u>, 65 F.3d at 808.

**B.    <u>Defendants' Motion</u>**

Defendants Adams, Smith, Tucker, Sherman, and Selvey argue that when they decided to place Plaintiff into administrative segregation and transfer him to another institution, there was no retaliatory motive.   Defendants argue that the undisputed evidence shows that Plaintiff was placed into administrative segregation and transferred because he had personal knowledge of an officer, and the officer believed that Plaintiff's presence in the institution would interfere with his ability to do his job effectively. Defendants assert that there is no evidence that they were aware that Plaintiff had filed grievances or lawsuits.  Defendants provide evidence that defendant Tucker issued the lockup order based on a concern for institutional safety, (DUF No. 45; Defts' Exh. A, ECF No. 136-2 at 79), and that defendant Selvy endorsed Plaintiff's transfer based upon a request from the classification committee, (DUF No. 47-48; Defts' Exh. A at 82.) Defendants assert that Plaintiff has pointed to no grievance that suggests retaliation by any of these defendants.

Defendants also argue that Plaintiff has not shown that he was subjected to an adverse action for engaging in protected conduct.  Defendants assert that evidence shows that Plaintiff's initial placement in administrative segregation was based on California Code of Regulations title 15 § 3335, which provides the guidelines for placing an inmate into administrative segregation:

> When an inmate's presence in an institution's general inmate population presents an immediate threat to the safety of the inmate or others, endangers institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity, the inmate shall be immediately removed from general population and placed in administrative segregation.

Cal.Code Regs, tit. 15, § 3335(a).  The lock-up order states that Plaintiff would remain in administrative segregation pending an investigation into Plaintiff's personal knowledge of an officer, and that defendant Tucker determined that Plaintiff's presence in general population was deemed a threat to institutional safety and security.  (DUF No. 45.)  Defendants argue that in <u>Barnett v. Centoni</u>,[12] the Ninth Circuit found that "preserving institutional order, discipline, and security are legitimate penological goals."

Defendants also cite undisputed facts showing that Plaintiff was placed into administrative segregation, and ultimately transferred because he has personal knowledge of an officer, and the officer believed that the knowledge would interfere with his responsibilities. (DUF No. 45.)  Under the California Code of Regulations title 15, § 3400, an employee must not "discuss their personal affairs with any inmate or parolee."  (DUF 44.)  Based on the officer's assertions and Plaintiff's letter to the Warden, defendant Adams requested Plaintiff's transfer.  (DUF Nos. 43, 46.)

## C.    <u>Plaintiff's Opposition</u>

In opposition, Plaintiff argues that the facts preclude summary judgment in favor of any defendant on Plaintiff's retaliation claim.  Plaintiff argues and refers to supporting evidence that he participated in protected First Amendment activity, of which Defendants Adams, Selvy, Sherman, Smith and Tucker knew, and Defendants Adams, Selvy, Sherman, Smith and Tucker each personally participated in acts causing Plaintiff to be removed from the general population and confined in administrative segregation between August 1, 2005 and August 11, 2005, and causing Plaintiff to be transferred to another prison facility on August 23, 2005, because of Plaintiff's participation in protected activity, without advancing legitimate goals of the correctional institution.

## D.    <u>Discussion</u>

The parties do not disagree that Defendants Adams, Smith, Tucker, Sherman, and Selvey participated in decisions to place Plaintiff into administrative segregation at SATF

---

[12] <u>Barnett v. Centoni</u>, 31 F.3d 813, 816 (9th Cir. 1994.)

beginning on August 1, 2005, and to transfer Plaintiff from SATF to another correctional institution on August 23, 2005, against Plaintiff's wishes.  It is also undisputed that Plaintiff had filed lawsuits and inmate grievances before August 1, 2005, which are protected First Amendment activities.  Further, no party has argued that such action by prison officials against an inmate, if taken in retaliation for participating in First Amendment activities, would not chill *or* silence a person of ordinary firmness from future First Amendment activities.   Thus, at issue here is (1) whether Plaintiff was placed in administrative segregation and transferred *because of* his First Amendment activities, and (2) whether Defendants' actions advanced legitimate goals of the correctional institution.

Defendants' evidence demonstrates that they had valid reasons, which furthered valid goals of preserving institutional order and security, for placing Plaintiff in administrative segregation and transferring him out of SATF.  It is undisputed that on July 19, 2005, Plaintiff sent a letter to SATF's Warden Adams regarding interactions he had with Officer Larios, advising Adams that Plaintiff knew Officer Larios' brother.  (DUF No. 43.)  Defendants provide a copy of Plaintiff's letter to Warden Adams, dated July 19, 2005, in which Plaintiff states that:

> With respect to CCR15 §3400 and 3401, I feel it might be necessary to document and report past interaction(s) I and my visitor(s) had with a correctional officer I just learned is working at the prison (the Calif. Substance Abuse Treatment Facility & State Prison).  From May of 2003 to February of 2004, I was imprisoned at the Calif. State Prison in Sacramento County (SAC).  While there, I received weekly visits from Natalie Bolds and B. Cayenne Bird.  During a visit at SAC sometime around June of 2003, I and Natalie Bolds were introduced by CDC Inmate Fernando Larios (#P25814) to his brother, who at the time was a CDC cadet at McGee.  On 7/15/05, at approximately 1130 hours, I was approached by an officer . . . [who] said I looked like a prisoner he had seen in a visiting room somewhere with a woman he referred to as my wife [and] closely described Natalie Bolds. . . Later, while talking to Natalie on the phone I suddenly realized that the officer who approached me in 3-Block that day, <u>A. Larios</u>, is the brother of Inmate Larios to whom Natalie and I were introduced about 2 years ago.

(ECF No. 136-2 at 78, Defts' Exh. A.)  The parties agree that under the California Code of Regulations title 15, § 3400, Familiarity:

> Employees must not engage in undue familiarity with inmates, parolees, of the family and friends of inmates or parolees.  Whenever there is

> reason for an employee to have personal contact or discussions with an inmate or parolee or with the family and friends of inmates and parolees, the employee must maintain a helpful but professional attitude and demeanor.  Employees must not discuss their personal affairs with any inmate or parolee.

(DUF 44.)  It is undisputed that on August 1, 2005, Plaintiff was issued a lock-up order notifying him that he was being removed from E-Facility and placed into administrative segregation because he had personal knowledge of a Correctional Officer on E-Facility, and that Plaintiff was advised that he would remain in administrative segregation until an investigation into the matter could be completed.  (DUF No. 45.)  Defendant provides as evidence a CDC for 114-D Administrative Segregation Notice dated and signed by J. T. Tucker on August 1, 2005, which explains:

> On Monday, August 1, 2005, you, Inmate KNAPP, J-10618, are being removed from Facility 'E' and re-housed in Administrative Segregation (Ad/Seg) at CSATF/SP.  The reason for this action is that you have PERSONAL KNOWLEDGE of a Correctional Officer on Facility 'E'. As a result you have been deemed a threat to the safety and security of this institution, its staff and inmates.  You will remain in Ad/Seg pending an administrative review of these circumstances.   This placement could affect your credit earning status as well as your visiting and privilege status.   This placement is ordered by Correctional Lieutenant J. T. Tucker.

(ECF No. 136-2 at 79, Defts' Exh. A.)  It is undisputed that on August 2, 2005, Warden Adams requested that Plaintiff be transferred to another institution due to Plaintiff's personal knowledge of a staff member.  (DUF 46.)  It is undisputed that Plaintiff appeared before the administrative segregation institutional classification committee on August 11, 2005, which recommended that Plaintiff be referred to the CSR for transfer to Pleasant Valley State Prison (PVSP) with an alternative placement at Salinas Valley State Prison (SVSP).  (DUF No. 48.)  Defendants provide a copy of a Classification Chrono CDC form 128G Initial ASU Review dated August 11, 2005, which indicates:

> OCC elects to refer [Inmate Knapp's] case to CSR with RX for TX to PVSP III SNY with an alternate of SVSP IV SNY O/R . . . [Knapp] is requesting transfer to PVSP.

(ECF No. 136-3 at 83, Defts' Exh. A.)  It is undisputed that the CSR, D. Selvy, endorsed K'napp from transfer to PVSP on August 11, 2005.  (DUF No. 48.)  Defendants provide a

copy of CDC form 128-G dated and signed by D. Selvy, CSR on August 11, 2005, stating "PVSP-III (SNY) endorsed" for inmate KNAPP, No. J-10618.  (ECF No. 136-2 at 84, Defts' Exh. A.)

Plaintiff declares that "Defendants Adams, Sherman, Smith, and Tucker did not reasonably advance a legitimate correctional goal by causing me to be confined in ad-seg on 8/1/05", (Pltf's Decl. ECF No. 147 at 111 ¶344), and "Defendants Adams, Sherman, and Smith did not reasonably advance a legitimate correctional goal by causing me to be retained in ad-seg and following 8/11/05, to be put up for transfer to another prison, and to be put up for transfer to a prison located far away from Sacramento," (Id. at 116 ¶377).  However, given the undisputed facts and Defendants' evidence discussed in the paragraph above, Plaintiff's argument fails, and he has not met his burden of demonstrating that there were no legitimate correctional purposes motivating the actions he complains of fails.  Therefore, Defendants are entitled to judgment as a matter of law on Plaintiff's retaliation claim.

## VIII.   QUALIFIED IMMUNITY

Defendants argue that they are entitled to qualified immunity for their actions. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id.

In determining whether an officer is entitled to qualified immunity, the court must decide (1) whether facts alleged or shown by plaintiff make out a violation of constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.  Pearson, 555 U.S. at 232 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand." Id. at 236.  In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

As discussed above, the court finds that Defendants did not violate Plaintiff's constitutional rights.  Therefore, the issue of qualified immunity shall not be addressed.

## IX.    CONCLUSION AND RECOMMENDATIONS

Based on the foregoing, the court finds no evidence that a genuine issue of material fact remains for trial, and the motion for summary judgment filed by defendants Adams, Smith, Tucker, Sherman, Selvy, Motty, Pugliese, Cooper, Garcia, Hall, and Guerrero ("Defendants") should be granted.  Accordingly, **IT IS HEREBY RECOMMENDED** that Defendants' motion for summary judgment, filed on October 22, 2014, be GRANTED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within twenty (20) days after being served with these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **September 1, 2015**                    **_/s/ Gary S. Austin_**
                                                          UNITED STATES MAGISTRATE JUDGE